**Benno RABINOF and Sylvia Rabinof, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 68 Civ. 3.**

United States District Court, S. D. New York.

July 9, 1971.

---

Julian A. Oshlag, Batavia, N. Y., for plaintiffs.

Whitney North Seymour, Jr., U. S. Atty., S. D., N. Y., for the United States, T. Gorman Reilly, Gerald A. Rosenberg, Asst. U. S. Attys., of counsel.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVET, District Judge.

This is the story of "The Lord Amherst," a Stradivarius violin once owned and played by Fritz Kreisler.[1] Dr. Ber-

---

1. "Antonio Stradivari, Italian violin maker, was associated throughout his life with Cremona, where he brought the craft of violin-making to its highest pitch of perfection." In 1684, he began to produce larger models than the smaller Amati model of his teacher, Nicolas Amati, "using a deeper coloured varnish, and beautifying them in various details, his long patterns (from 1690) representing a complete innovation in the proportions of the instrument; while from 1720, after

nard Mortimer, a physician, a music lover, although not a musician, bought the violin in 1958, paying $20,000 for it, loaned it to Benno Rabinof, a concert violinist, to play. Later, Mortimer became involved with the Internal Revenue Service of the United States of America in respect to income taxes and the government levied a tax lien against The Lord Amherst.

Subsequently, on January 2, 1968, Rabinof and his wife, Sylvia, a concert pianist, instituted this action to secure a determination that the famous musical instrument and bows no longer belonged to Mortimer but to violinist Rabinof, to enjoin the enforcement and to discharge said levy.

Plaintiffs' claims: *First*, that subsequent to the purchase of the violin, Mortimer gave the $20,000 instrument to Rabinof in 1958 [2] (214–215) [3] ; *Second*, alternatively, if not donated, that Rabinof acquired ownership of the violin by adverse possession.

More particularly, as set forth in the pretrial order, plaintiffs' claim was as follows:

"Plaintiffs contend that in November of 1958 an oral gift of the violin accompanied by delivery thereof to plaintiff, Benno Rabinof, in the City of New York was made and that title to the violin had since that date been in the plaintiff, Benno Rabinof. Plaintiffs further contend that by formal document received by them by mail in New York City on or about September of 1959, by written instrument Dr. Bernard Mortimer and Dr. Edna Mortimer against made unconditional and unqualified gift of the said violin to the plaintiffs and that plaintiffs have had full and complete ownership of said violin and continue to have such unconditional and unqualified and full and complete ownership of the said violin down to the present time."

No jury was demanded and the case was tried before the court.

After hearing the testimony of the parties and examining the pleadings, the exhibits and the proposed Findings of Fact and Conclusions of Law submitted by counsel, I make the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Benno Rabinof is and has been a concert violinist for many years (12, 13, 14, 15). In 1938 he married the co-plaintiff, Sylvia Rabinof, a concert pianist (15, 16). In 1954, when the musical duo gave a concert in Joliet, Illinois for the Civic Music Association they met Dr. Mortimer and his wife, Edna, also a physician (16, 17), at a dinner party at the Mortimers' residence (19, 20).

2. Dr. Bernard Mortimer was licensed in 1934. From 1943 until 1965 he resided in Joliet, Illinois, where he practiced medicine, obstetrics and gynecology. He and Mrs. Mortimer now live in Pennsylvania (253, 255, 256).

Mortimer had developed an interest in violins while working in his college days as an usher for the Chicago Civic Opera. There he heard many violin concerts with the great violinists of that age, Fritz Kreisler, Jascha Heifetz, Eugene Ysaye, and many others. He continued this avocational interest, starting a small library with books on the violin and later accumulating a large volume on the Stradivarius violins (254). He was es-

---

for a few years returning to an earlier style, he again broadened and otherwise improved his model. * * * The Stradivari method of violin-making created a standard for subsequent times; but the secret of his varnish, soft in texture, and shading from orange to red, though much debated, has never been discovered." Stradivari, Antonio, 21 Encyclopedia Brittanica, p. 446.

2. Plaintiffs stipulated that they will not contend that there was any gift made in 1964 by Mortimer or Mrs. Mortimer except, however, that they will contend that there was a written confirmation in 1959 (SM 9, 10) of a 1958 gift (SM 214–215).

3. Unless otherwise identified, numbers in parentheses refer to pages in the stenographer's minutes of the trial.

pecially interested in Fritz Kreisler and his concerts, having had personal contact with him (255). He was a subscriber and later became president of the Joliet Civic Music Association in connection with the activities of which he met plaintiffs (256–257).

3. Between 1954 and the end of 1958, the plaintiff-musicians were living at 344 West 72 Street, New York City. They toured constantly and visited the Mortimers or talked to the Mortimers by telephone (33–36). The Mortimers occasionally communicated with the Rabinofs when they came to New York City and at times all four ate together at restaurants (105–106). Rabinof has always lived in New York City except for tours and vacations (61–62).

4. In the fall of 1958, the Rabinofs and the Mortimers dined together in a New York City restaurant known as the "Forum of the Twelve Caesars," sometimes called the "Roman Forum" (317), while the Mortimers were staying at the St. Regis Hotel (37–39). At this time Mortimer asked Rabinof if he had ever played a violin which he liked, whereupon Rabinof said that there was one, the Stradivarius which he had heard Kreisler play at a concert in New Brunswick (43). Rabinof later recounted its history to Mortimer in a telephone conversation (262–263). Because this violin had been played at one time by Fritz Kreisler it was also known as the Lord Amherst-Kreisler Stradivarius (43, 262–263, 414; Exs. 9, 10, 11a–c, 41, 51, 52). Mortimer said, "Why don't you play that violin." (44–47) Then, outside the Roman Forum, Mortimer said, "Buy that violin." (45, see also 149–153)

5. After these conversations at the Roman Forum, Mortimer telephoned Rabinof several times in the fall of 1958, asking him if he knew where the violin was; when Rabinof said, "No," Mortimer said, "Why don't you find out." Later, Rabinof and Mortimer again talked about the violin and Mortimer said he would go to see it (265). After lunch Mortimer went to the studio of

one Francais to see the instrument, and one of the visitors there played it for him (266, 319, 320). In October 1958, Mortimer telephoned Francais and as a result Francais telephoned the owner of the violin, a Mrs. Gordon. Mortimer purchased the violin at the end of October 1958 for $20,000.

6. Payment of the $20,000 purchase price by Mortimer was made by a series of five bank money orders, dated October 30, 31, November 7, 13 and 19, 1958, which were sent to Jacques Francais by mail (271–277; Exs. 4, 5, 7, 8; Pretrial Order ¶3(a) (i) and (iv)). It is significant that on or about September 3, 1959, plaintiff Rabinof apparently told Allyn Baum, a New York Times photographer, that the violin was valued at more than $75,000 and is called "one of the three greatest Strads" in the world (Ex. 51) and that on November 9, 1967 Francais wrote Mortimer that "It has a fair insurance value on today's market of $40,000." (Exs. 41, 41a) It is most unlikely that Mortimer would have donated a violin of the value of from $20,000 to $75,000 to Rabinof. It is also noteworthy that on June 4, 1971 the New York Times reported as follows:

> "LONDON, June 3—A world's record auction price for a violin was established today when the firm of W. E. Hill & Sons paid £ 84,000, or a little more than $200,000, for a Stradivarius. The previous record, also at a Sotheby's auction, had been set in 1968 for the Marie Hall Stradivarius, which fetched $53,000."

7. On November 25, 1958, Jacques Francais mailed to Mortimer a bill of sale for the Lord Amherst violin (277–278; Ex. 9) and sent him the certificate of authenticity for the violin which had originally been issued in 1936 to W. E. Hill & Sons of London to Fritz Kreisler (283–286; Ex. 10). On November 3, 1958, Mortimer wrote Francais in part: "We are very happy with *our acquisition* and feel that Benno will surpass himself with this fiddle." (Emphasis supplied) (Ex. 5)

8. Jacques Francais has been a violin maker and dealer for twenty years in New York City, selling about one hundred violins a year (381–382). Francais had known Rabinof for about twenty years as a business acquaintance and as a friend (384–385). He also knew Mortimer as a business acquaintance (405), having met him for the first time in 1957, when Mortimer came to buy a violin (385–387). He sold Mortimer a Sancta Seraphim violin for $4,500. Later, Mortimer asked Francais to resell it (387–388; see also Stip. pp. 4, 5). The Lord Amherst Stradivarius violin, subject of this suit, had been consigned to Francais by Mrs. Ruth Gordon, the owner, widow of violinist Jacques Gordon. Rabinof had expressed an interest in playing the Lord Amherst violin, and while it was on consignment to Francais he had loaned it to Rabinof to play after Rabinof had expressed a desire to borrow the violin in connection with a television show (391–392). In 1958, Rabinof came to Francais and told him that he was under the impression that Mortimer would buy the Stradivarius and, in turn, that Mortimer would loan it to him, Rabinof (389).

9. Subsequent to the purchase of the Lord Amherst, Mortimer gave instructions to Francais to permit Benno Rabinof to pick up his Stradivarius violin because he "was allowing him to play it." (279) Through Francais and with the same broker who had insured his previous violin, Mortimer made arrangement for insurance of the Stradivarius in his name only (279–281, 397, 398; see Exs. 11a, b and c). Binders were received in early October 1958 (see Ex. 12; 281). Mortimer continued to reinsure the violin in his name (see Exs. 15a–c, 17a–c, 47a, b, 49a, b; 282). Mortimer also received from Francais at the time of the purchase a certificate of title of ownership of the violin and the certificate of authenticity issued by Hill of London (violin dealers) (see Ex. 10; 283–286). With the exception of the period October 21, 1965 to October 31, 1967 when Mrs. Mortimer was named,

Mortimer was named as the only assured party in these policies (282–283; Exs. 15a–c, 17a–c, 47a–b, 49a–b). The violin and the bows, after delivery to Rabinof, have remained in the constant possession of Rabinof (Stip. 6, p. 5).

10. In various insurance policies issued to Mortimer as owner endorsements in substance indicated that this violin was "in the care, custody and control of the assured, that is Mortimer, and/or Benno Rabinof." This included the following:

| PERIOD OF POLICY | EXHIBIT |
|---|---|
| October 31, 1958 to October 31, 1961 | 11c |
| October 31, 1961 to October 31, 1964 | 15a |
| October 31, 1964 to October 31 1967 | 17a |

The insurance was split into various policies of different companies. Other policies which contain similar endorsements are as follows:

| PERIOD OF POLICY | EXHIBIT |
|---|---|
| August 1, 1959 to October 31, 1961 | 11a |
| August 1, 1959 to October 31, 1961 | 11b |
| October 31, 1961 to October 31, 1964 | 15b |
| October 15, 1965 to October 31, 1967 | 17b |

The total premium on the $28,000 coverage of the Lord Amherst violin appears to have been approximately $400 annually (see Ex. 11a). Later, after the addition of the bows, this insurance was increased to $29,725, making a total premium of $467.44 (see Ex. 17a). Plaintiffs' contention that Mortimer would have continued to insure the violin and the bows and paid premiums ranging from approximately $400 to $467.44 per annum, after a donation to Rabinof, is a patent absurdity.

11. Rabinof picked up the violin from the showroom of Francais on or about October 5, or 6, 1958, after a call

from Francais (58–61). Rabinof took out no insurance on the violin, although it was an important asset to his musical career (155). At the time of purchase and since that time the violin has been in his possession and has never left his possession except for the purpose of repairs (61). Aside from use on tours, the violin has been physically located in New York City. Rabinof conceded that at the time of the purchase of the violin through Francais it was valued at $20,000, the amount Mortimer paid for it. Rabinof made no attempts to have the violin evaluated for insurance purposes and was not concerned with insurance (156). He never insured the violin until 1964, after Mortimer was convicted in a tax case (157–158). Although Rabinof brought the Lord Amherst into Francais' showroom several times after 1958 for the purpose of cleaning it and maintaining its condition, he never asserted to Francais that he was the owner of the Lord Amherst (403).

12. Rabinof testified that in a telephone call by Mortimer shortly before the purchase of the violin in 1958, this conversation took place: "I said, 'Mort, I don't want that violin because I can't afford to buy it.' And then he [Mortimer] said, 'I want to buy it for you.'" (46) However, under all the circumstances surrounding the purchase of the violin and the facts following such purchase, it is impossible for this court to conclude that Mortimer, even if such a statement were made, intended to give the violin to Rabinof.

13. After Rabinof picked up the violin in 1958, a telephone conversation took place (287–288) in which Mortimer asked Rabinof to stop at his home in Joliet on his tour so that the Mortimers could see the Stradivarius violin. Rabinof agreed and later visited the Mortimers' home in November 1958, bringing with him the Stradivarius (288–289). Mortimer took some pictures. Rabinof commented that he was happy to be able to play the Stradivarius and that he felt it would enhance his career (289–290), to which Mortimer replied that he was pleased to be able to provide Rabinof with the means to do this by letting him play "my Stradivarius." (290) During the course of this visit it was agreed between Mortimer and Rabinof that violin bows of a high quality should be purchased for use with the Lord Amherst and that Rabinof would look for such bows while on tour in Europe (310). Mortimer filed no gift tax returns with the United States Government for the year 1958 (290). While plaintiffs admitted that they were grateful to Mortimer for his generosity in letting Benno Rabinof play the violin, they admitted that they never wrote him a letter thanking him for his $20,000 "gift" (154–155).

14. In the latter part of November 1958, when Mortimer proposed to buy a bow, Rabinof said he would look around for suitable bows on his next tour to Europe (309–310). On February 8, 1959, Benno Rabinof cabled Mortimer from Europe that he had located two beautiful bows for $1,500 (311; Ex. 20). Mortimer cabled back the requested $1,500 and Rabinof purchased the two bows, one a Peccatte and the other a Tourte (251, 311–313; Exs. 21 and 22).[4] The bows have remained in the constant physical possession of Benno Rabinof ever since (Pretrial Order ¶ 3(a) (vi)). The Peccatte and Tourte bows were insured by Mortimer as the owner of same from at least June 29, 1959 until March 1970. With the exception of the period October 21, 1965 to October 31, 1967, when Mrs. Mortimer was named as the assured, the coverage of these insurance policies with respect to the two bows extended only to Mortimer (Exs. 11a–c, 15a–c, 17a–c, 47a–b, 49a–b).

15. On September 3, 1959, one Gay Talese, a reporter for The New York Times, interviewed Rabinof at Rabinof's residence (356–359). He did not recall

---

4. Although the stipulation in the pretrial order at paragraph 3(a) (v) is that the bows were purchased for $1,000, the court will follow the actual evidence showing the purchase price to be $1,500.

whether Rabinof made a telephone call during the interview or whether he asked Rabinof to make any telephone call (361). He was not advised by his superior of any gift of a Stradivarius to Rabinof (363). Later that day, Allyn Baum, now a senior assistant editor with the economics division of Litton Industries, and in 1959 a photographer for The New York Times, arrived at Rabinof's apartment. He took photographs of Rabinof, the violin and the bows (372, 373–375). He confirms the fact that Rabinof made no telephone call (380). Exhibit 10, an article written by Gay Talese and published in The New York Times on September 4, 1959, was admitted by the court (209), whereupon the government attorney moved to strike it and the court reserved decision. I deny the motion. The exhibit does not sustain plaintiffs' claim to the violin but, rather, indicates the absurdity of plaintiffs' claim. Rabinof's apparent explanation to Talese, set forth in the note below, is an evident fantasy which is not supported by any evidence in this case.[5] In any event, no credible evidence supports Rabinof's claim that on September 2 or 3, 1959, or on any other date, Mortimer gave Rabinof any authority to state to Talese that Mortimer had given Rabinof the Stradivarius violin.

16. Rabinof and Mrs. Rabinof each place the visit of The New York Times representatives on September 2, 1959 (130–131, 160–166) and point to a record of a telephone call to Joliet on September 2, 1959 (Ex. 7). However, in view of the testimony of Talese, Baum and Mortimer, I am not convinced that Mortimer was notified by Rabinof of any prospective publication to the effect that a gift had either then or thereafter been made or that he agreed to such a statement. At most, it was "good publicity" for Benno Rabinof.

17. On September 4, 1959, a feature story appeared in The New York Times under Mr. Talese's by-line concerning the Lord Amherst violin. A photograph of Mr. and Mrs. Rabinof together with the violin accompanied the article (131, 358, 377–378; Exs. 10, 51). The article, which was almost entirely based on information supplied by Benno Rabinof, stated that the violin had recently been handed over to him by an anonymous friend who arrived for lunch at a New York restaurant with the violin under his arm. The friend was described as saying that he wished to hear the violin "sing again." (368–369) The fantastic account of the gift of a Stradivarius in that fashion beggars belief. Mortimer, who was in Joliet, Illinois at the time, did not read, nor did he have the opportunity to read, the article concerning the Lord Amherst violin as it appeared in The New York Times (Ex. 10). He read a copy of the article for the first time in April of 1971 (291–292).

18. Some time prior to 1964, Mortimer received one of several publicity brochures which was sent out by the Rabinofs' booking agents and which stated that Benno Rabinof was playing the Lord Amherst Stradivarius violin. Shortly thereafter, Mortimer sent off a brief note to Rabinof to the effect that he felt that the brochure was "good publicity for the Strad." (199–202, 292–294; Ex. 8).

19. Plaintiffs' Exhibit 12, purporting to be a letter, was admitted by the court for limited purposes (430). It reads as follows:

"Dear Benno & Sylvia

"It is our pleasure to present to you the Lord Amherst Fritz Kreisler Stradivarius with deepest humility—to hear this instrument sing.

"All our Love

"Edna & Mort

"Signed: Bernard Mortimer

Edna Z. Mortimer"

5. The explanation typed by Baum on the photograph is as follows:
"The violinist said he was recently invited to dine in a New York restaurant by the quiet man—a violin enthusiast whom he originally met eight years ago.
"The man arrived at the restaurant with the encased violin under arm; and, after dinner, handed it to Mr. Rabinof."

The letter, even if considered in full, has no probative force. It is not dated; there is no proof that it was delivered in 1958, the year in which plaintiffs claim a gift to have been made, or any other time. It cannot confirm an alleged 1958 gift since no proof of such a gift exists. There was no proof of an original or sufficient foundation for admission of an alleged copy. It is not at all conclusive in light of all the other circumstances in the period from 1958 to 1963 and even thereafter. "To hear this instrument sing" is entirely consistent with the purpose of the loan by Mortimer.

20. In the winter of 1963, between Christmas and New Years, while Mortimer was a patient in the New York Hospital, he called Rabinof and asked him to come and bring the violin so that he could hear it; Rabinof came on January 2, 1964 and played the violin at the hospital for Mortimer (297–298). At that time Rabinof told Mortimer how pleased he was to be playing the violin (299).

21. On or about March 31, 1964 (299, 438), Mortimer was convicted in the United States District Court for the Northern District of Illinois for income tax evasion with respect to the taxable years 1957 through 1960 (Stip. 7; 5, 6). He was then placed in custody and spent eight months and eighteen days, from October 25, 1965 until July 12, 1966, at a federal penitentiary in Sandstone, Minnesota (308–309). During the course of the trial, in response to questioning by the court, Mortimer testified that he and his wife owned the Lord Amherst Stradivarius violin (436). The trial generated a great deal of publicity with respect to the violin (296–297).

22. At the tax trial in Chicago in 1964, Mortimer testified as follows:

" 'Q. Did you give the violin to Benno Rabinof anonymously?

" 'A. Yes, sir.' " (336)

It is not inconsistent with the fact that Mortimer loaned the violin to Rabinof (anonymously); furthermore at the Chicago trial the facts were clarified by the following testimony of Mortimer:

" 'The Court: You are telling me now that you and your wife own it, is that right?

" 'The Witness: Yes, Sir.

\*   \*   \*   \*   \*   \*

" 'The Court: You are telling me now that you and your wife own it, "referring, I assume, to the Stradivarius," is that right?

" 'The Witness: Yes, sir.

" 'The Court: All right.' " (SM 336)

23. A few weeks later Mortimer received a letter from Rabinof dated May 8, 1964. The letter made no explicit reference to the Lord Amherst nor did it provide the promised explanation why it would be better for Rabinof to keep the violin.[6] The letter concluded with the following words: "We are planning to help you all we can. Please continue your faith in us.[7]" (302–303; Ex. 34) The letter made no claim of ownership of the prized violin.

24. Subsequently, Mortimer had two telephone conversations with Rabinof, one in the middle of April 1964 and the other about May 26, 1964. In the April conversation Mortimer told Rabinof that he requested him to return his violin; Rabinof said that he needed the violin to continue to play on his tour. Rabinof also told Mortimer, "I know you have had heavy expenses with your trial and

---

6. See Findings of Fact 24 and 25.

7. The complete letter was as follows:
   "Dear Edna and Mort,
   "Our feelings toward you both are and will remain full of love and sympathy. Your difficulties in these times are something only God and time can heal. We are praying for your speedy and complete

recovery, and feel very sorrowfully over Edna's loss. We are planning to help you all we can. Please continue your faith in us.

   "With all our love,
   "Always,
   "Benno and Sylvia Rabinof"
   (Ex. 34)

you may want to sell it. I would like to have the opportunity to purchase the violin" whereupon Mortimer said, "I wish you to return my violin. We have to reorganize my entire life after this adverse decision and I want to get all my assets together to see what I have to do." Rabinof said he needed to play the violin on the tour and that it would be better for him to keep it at this time, but Mortimer protested, and Rabinof said, "You will hear from me." (300–302; see also Ex. 34, a note dated May 8, 1964)

25. Mortimer placed a second telephone call to Benno Rabinof on or about May 26, 1964. He questioned Rabinof why he had retained counsel with respect to the Lord Amherst since Rabinof knew perfectly well that he, Mortimer, owned the violin. Rabinof did not contradict this statement nor did Rabinof assert that he owned the violin. He merely told Mortimer that the lawyer who was advising him was his brother-in-law, one Tepper. Rabinof repeated that it was very important for him to be able to play the violin; that it would be better if the Rabinofs kept it at that time; and that the Mortimers would be hearing from him. Prior to the commencement of this action on January 2, 1968, the Mortimers never heard from Benno Rabinof again (303–307).

26. Rabinof's testimony places a so-called "demand" in the fall of 1963, "probably October" (120–122). According to Rabinof, Mortimer said, "Benno, I want the violin back," whereupon Rabinof said, "I thought you gave it to me as a gift." (122) The doctor, said Rabinof, hung up. I discredit this testimony, but, even if accepted, it does not support a hostile possession. Rabinof at no time refused to return the violin. At no time did he say, "It is mine." The fact that Rabinof instructed his attorney, Tepper, to insure the violin, without any notice thereof to Mortimer, does not create an adverse right.

27. On or about December 6, 1966, the Chicago District Director of the Internal Revenue Service filed tax assessments against Drs. Bernard and Edna Mortimer for the taxable years 1957 through 1960. These assessments total $91,132.44, including interest to December 16, 1966 (Stip. 8; 6).

28. On June 30, 1967, when plaintiff Benno Rabinof was about to give a concert in Chicago, a notice of levy was served on him demanding the delivery of the violin and the bows (Stip. 9; 6).

29. Rabinof did not have these instruments with him and hence, he did not honor the levy. Rabinof did not thereafter honor the levy and on January 2, 1968, he and Mrs. Rabinof filed this action pursuant to Section 7426 of the Internal Revenue Code of 1954 (26 U.S.C.), and Section 1346(a) (2) of Title 28, United States Code, seeking a judgment declaring them to be the owners of the violin and the bows, discharging the notice of levy of June 30, 1967, and enjoining the defendant from enforcing that levy during the pendency of this action (Stip. 10; 6).

30. As to the gift issue, I find:

(a) Mortimer made a loan of the Lord Amherst Stradivarius violin to Benno Rabinof in 1958 (see Findings of Fact 4–14 inclusive).

(b) Mortimer never intended to make a gift of the Lord Amherst Stradivarius violin to Benno Rabinof and/or Sylvia Rabinof (see Findings of Fact 4–20 inclusive).

(c) Benno Rabinof acted as Mortimer's agent in purchasing the Peccatte and Tourte violin bows in Paris during February of 1959 (see Finding of Fact 14).

(d) Mortimer never intended to make a gift of the Peccatte and Tourte violin bows to Benno Rabinof and/or Sylvia Rabinof (see Findings of Fact 13, 14).

31. As to the issue of adverse possession, I find:

(a) Neither Benno Rabinof nor Sylvia Rabinof ever asserted a claim of ownership of the Lord Amherst Stradivarius violin until the filing of the complaint in this action (see Findings of Fact 24–26 inclusive).

(b) Prior to the filing of the complaint in this action, neither Benno Rabinof nor Sylvia Rabinof ever possessed the Lord Amherst Stradivarius violin in a manner hostile to the rights of Mortimer (see Findings of Fact 4–20 inclusive, 23–26 inclusive).

(c) Neither Benno Rabinof nor Sylvia Rabinof ever asserted a claim of ownership to the Peccatte and Tourte violin bows until the filing of the complaint in this action (see Findings of Fact 24–26 inclusive).

(d) Prior to the filing of the complaint in this action, neither Benno Rabinof nor Sylvia Rabinof ever possessed the Peccatte and Tourte violin bows in a manner hostile to the rights of Mortimer (see Findings of Fact, 16, 17).

32. Plaintiffs have failed to prove by a fair preponderance of the credible evidence that Mortimer and/or Mrs. Mortimer ever gave plaintiffs or either of them the Lord Amherst violin or the bows relating thereto or that said plaintiffs or either of them became entitled to said violin or the said bows by adverse possession or otherwise. Hence, the United States is entitled to judgment dismissing the complaint.

## DISCUSSION

Factors which the United States contends support the application of Illinois law may be summarized as follows:

1. Mortimer was from at least 1954 until 1965 a resident of Joliet, Illinois.

2. Mortimer was a resident of Illinois at the time of the purchase of the violin in 1958 and at the time when Rabinof contends a gift was made (1958).

3. Mortimer was still a resident of Illinois in 1963 and when Rabinof claims a demand (allegedly to support the claim of adverse possession) was made.

The "contacts" in this case connected with the State of New York are as follows:

1. Plaintiffs at the time of the purchase of the violin and at the time it was loaned to Rabinof lived in New York City.

2. At the time of the purchase and at the time of its lending, the violin was in New York City.

3. Since that time the violin has been physically present in New York City except when played by Rabinof while on tour.

4. The arrangements for the purchase were made while Mortimer was in New York City and were consummated in New York City. New York law thus is applicable.

5. On June 30, 1967, the United States served Rabinof with a notice of levy demanding delivery of the Lord Amherst violin and bows.

## GIFTS

### NEW YORK LAW

■ The law never presumes a gift. Matter of Bolin, 136 N.Y. 177, 180, 32 N.E. 626 (1892). On a doubtful record the ruling must be against a gift. In re Grauds' Estate, 43 N.Y.S.2d 803 (Sur. Ct., N.Y. 1943).

The Court of Appeals of this State has enunciated the fundamental elements of a gift as follows:

"* * * A gift may be defined as a voluntary transfer of his property by one to another, without any consideration or compensation therefor. To make it valid, the transfer must be executed, for the reason that, there being no consideration therefor, no action will lie to enforce it. To consummate a gift there must be such a delivery by the donor to the donee as will place the property within the dominion and control of the latter, with intent to transfer the title to him. * * *" Gray v. Barton, 55 N.Y. 68, 72 (1873).

■ It is obvious that the burden of proof is upon plaintiffs and that they must prove each and every element essential to establish the gift. Matter of Housman, 224 N.Y. 525, 121 N.E. 357 (1918); Matter of Kelly, 285 N.Y. 139, 150, 33 N.E.2d 62 (1941).

The evidence must be clear and convincing. Hemmerich v. Union Dime Savings Institution, 205 N.Y. 366, 369, 98 N.E. 499 (1912); Matter of Van Alstyne, 207 N.Y. 298, 100 N.E. 802 (1913); Matter of Kelly, 285 N.Y. 139, 150, 33 N.E.2d 62 (1941). The "clear and convincing" test is not confined to instances in which the purported donor is deceased. Matter of Kelly, supra; Hemmerich v. Union Dime Savings Institution, supra.

Plaintiffs, to convince this court that a gift of the violin and bows had been made, must demonstrate that Mortimer had a clear and unequivocal intention to vest title in Rabinof, as a donee. McKenzie v. Harrison, 120 N.Y. 260, 266, 24 N.E. 458 (1890); Gannon v. McGuire, 160 N.Y. 476, 481, 55 N.E. 7 (1899). "An absolute gift requires a renunciation by the donor, and an acquisition by the donee of all interest in and title to the subject of the gift." Curry v. Powers, 70 N.Y. 212, 217 (1877).

### THE LAW OF ILLINOIS

Under the law of Illinois, "[T]he burden of proving all facts required to create a valid gift inter vivos is on the donee. The essential facts to be established are the delivery of the property by the donor to the donee, with the intent to pass the title. To sustain the gift, the proof must be clear and convincing." People v. Polhemus, 367 Ill. 185, 10 N.E.2d 966, 969 (1937).

In Pocius v. Fleck, 13 Ill.2d 420, 150 N.E.2d 106, 111 (1958), the court wrote:

"The burden of proof rests upon the donee to prove all the facts essential to a valid gift. To constitute a valid gift, it is essential to prove the delivery of the property by the donor to the donee, with the intent to pass the title to the donee absolutely and irrevocably, and the donor must relinquish all present and future dominion and power over the subject matter of the gift. [Citations omitted]"

There is no doubt that under the law of Illinois "the burden of proof of a gift is on the donee and that such proof must be by clear and convincing evidence." Keshner v. Keshner, 376 Ill. 354, 33 N.E.2d 877, 881 (1941), citing Rothwell v. Taylor, 303 Ill. 226, 135 N.E. 419; Hill v. Bowen, 8 Ill.2d 527, 134 N.E.2d 769, 773 (1956).

" * * * In addition to donative intent, other elements must be present. The donor must part with exclusive dominion and control over the subject of the gift and there must be delivery. * * *" Frey v. Wubbena, 26 Ill.2d 62, 185 N.E.2d 850, 856 (1962).

The Law of Gifts in the State of Illinois appears to be similar to that of New York.

Plaintiffs' contention that the burden of proof that the violin and bows are the property of Dr. and Mrs. Mortimer is on defendant does not apply in this action.

In Manning v. Anderson Galleries, Inc., 130 Misc. 131, 133, 222 N.Y.S. 572, 574 (Sup.Ct. 1927), Judge Staley wrote:

"Possession of property alone and without explanation is evidence of ownership; but it is the lowest species of evidence. It is merely presumptive, and liable to be overcome by any evidence showing the character of the possession, and that it is not necessarily as owner. Rawley v. Brown, 71 N.Y. 85. A title resting on mere possession must yield to a proven title of ownership."

Stuart v. Willis, 244 F.2d 925 (9th Cir. 1957), merely states that the property of a third person is immune from seizure to enforce the liability of a person owing the tax.

United States v. Clinton, 260 F.Supp. 84 (S.D.N.Y.1966), and United States v. Herzfeld, 271 F.Supp. 185 (S.D.N.Y. 1967), have no application to the present case.

Here plaintiffs claim ownership upon the basis of a gift or upon adverse possession. As to these issues the burden is upon plaintiffs.

The acts of the parties at or about or after the time of the alleged

"gift" do not support the claim by plaintiffs of the gift of the violin or its bows.

1. Mortimer insured the violin in his own name and continued to pay substantial premiums for such policies (see Findings of Fact 9, 10, 14).

2. It was not until 1964 that Rabinof attempted to insure the violin in his name and he gave no notice to Mortimer of such effort (see Finding of Fact 11).

3. Mortimer filed no gift tax returns for the years 1958 or 1959 (see Finding of Fact 13).

4. At Mortimer's trial in Chicago in March of 1964, he testified clearly that he and his wife were the owners of the Stradivarius violin then in plaintiffs' possession (see Findings of Fact 20, 21).

5. The letters of appraisal written over the years by Jacques Francais, a friend of Rabinof, indicate that Mortimer was the title holder while Rabinof was merely the possessor (see Findings of Fact 7, 9).

6. The records of Rembert-Wurlitzer, which are the ordinary business entries of a firm specializing in buying, selling and appraising rare and valuable violins, indicate that Mortimer purchased the violin in 1958 and show only that possession of the violin passed to plaintiffs.

The forensic statements of plaintiffs are basically attempts to produce something out of nothing, to create a semblance of a gift from their own fantastic interpretations of the words of their benefactor.

Plaintiffs have failed to prove a gift by Mortimer by a fair preponderance of the credible evidence and the claim of any gift must be dismissed.

I am inclined to believe that New York would apply the law of Illinois to the question of the alleged gift, but it is also my opinion that it makes no difference in the outcome at which I have arrived. Under either Illinois or New York law, plaintiffs have failed to prove a gift.

## ADVERSE POSSESSION

Obviously, if there was a gift in 1958, no adverse possession could be initiated in 1963 or 1964. The submission of this claim is a clear derogation of the claim of donation or gift.

Ownership of a chattel may be lost or acquired through adverse possession which is actual, open and notorious, exclusive, hostile, under claim of right, and uninterrupted for the statutory period. 2 C.J.S. Adverse Interest §§ 236, 237, p. 884, and cases cited.

## THE ILLINOIS LAW

Chapter 83, Section 16 of the (S.H.A.) Illinois revised statutes provides that the owner of personal property must bring an action to recover his chattel within five years after the cause of action against the wrongful possessor accrues. In order to prevail the possessor must have satisfied all the requirements of adverse possession for the statutory period.

In Illinois, since there are few reported cases relating to adverse possession of personalty, recourse must be had to cases in the field of realty law. O'Connell v. Chicago Park District, 376 Ill. 550, 34 N.E.2d 836 (1941); Isham v. Cudlip, 33 Ill.App.2d 254, 179 N.E.2d 25 (1962); Carr v. Barnett, 21 Ill.App. 137 (1887); Worthy v. Guthrie, 292 Ill.App. 647, 10 N.E.2d 970 (1937).

Two fairly recent decisions of the Illinois Supreme Court enunciate the requirements necessary to prove adverse possession. In Thomas v. Durchslag, 404 Ill. 581, 90 N.E.2d 200, 204 (1950), the court held that "[I]t was necessary for him to establish a possession of that character by clear, positive and unequivocal proof that his possession was adverse, actual, visible, notorious, exclusive, continuous and under a claim of right. [Citations omitted]" In another decision, Wiedrich v. Howard, 7 Ill.2d

589, 131 N.E.2d 508, 510 (1956), the Illinois Supreme Court amplified these standards:

"* * * [T]he evidence presented * * * must constitute the strict, clear and unequivocal proof required to overcome the presumptions in favor of the true owner, namely that [the alleged adverse possessor has] been in hostile, actual, visible, notorious, exclusive, and continuous possession, under claim of ownership inconsistent with ownership of the holder of record * * *."

■ Since the use of the violin by Rabinof was originally permissive, the law cannot presume that it is hostile. Mere acquiescence by the owner is insufficient. Sundstrom v. Village of Oak Park, 374 Ill. 632, 30 N.E.2d 58 (1940). "[P]ermissive use can never ripen into prescription no matter how long such permissive use exists." Poulos v. F. H. Hill Co., 401 Ill. 204, 81 N.E.2d 854, 859 (1948). Moreover, Rabinof must prove that Mortimer was informed that he, Rabinof, was asserting title to the violin. Worthy v. Guthrie, 292 Ill.App. 647, 10 N.E.2d 970 (1937).

## NEW YORK LAW

"* * * With respect to personal property, where one has had the peaceable, undisturbed, and open possession of it, under an assertion of ownership, for the 6-year period which bars an action for its recovery by the real owner, he has acquired a good title or at least a superior title to that of the owner. * * *" 2 N.Y.Jur. § 105, p. 130; Lightfoot v. Davis, 198 N.Y. 261, 267, 91 N.E. 582 (1910). See also Monnot v. Murphy, 207 N.Y. 240, 100 N.E. 742, (1913); Reid v. City of New York, 274 N.Y. 178, 8 N.E.2d 326 (1937).

"The burden is on one who asserts adverse possession as a ground for title to personal property to show not only long-continued possession, but such possession as bars remedies and gives title; and if the possession was permissive, the presumption is against its being adverse to the real owner, and the burden of proving the contrary is on the party asserting title. * * *" 2 C.J.S. Adverse Possession § 245, p. 890, and cases cited.

"* * * where the possession is permissive in its inception, its character will be changed to adverse, so as to permit the running of the statutory period only when the possessor evinces a claim of ownership by some tangible act in hostility to the rights of the real owner." 2 C.J.S. Adverse Possession § 241, p. 886, and cases cited.

In this record there was no indication of any semblance of a claim of right until the fall of 1963 (see Finding of Fact 26). Even if this testimony were credible, it still clearly does not constitute a claim of right.

Although there is some contention that Mortimer in 1964 saw some publicity about Rabinof and the violin, there is no proof that any publicity about Rabinof's claim that Mortimer had given him the violin in 1958 or at any other time had come to Mortimer's notice.

The testimony of Mortimer as to telephone conversations of April and May 1964 indicates no *adverse* or hostile possession of the violin by Rabinof or under any claim of right. Likewise, the testimony of Rabinof, even if taken at its face value, does not prove otherwise.

Under neither Illinois nor New York law have plaintiffs demonstrated any clear and unequivocal proof of any adverse possession that has been hostile, actual, visible, notorious, under a claim of ownership inconsistent with the holder of record, Mortimer.

The government concedes a three-year statute of limitations in New York (221) and stated that the statute in Illinois is five years (222).

The levy was made on June 30, 1967 and the levy is the date controlling (223).

■ The Illinois statute of limitations for the recovery of a chattel is five years, S.H.A. Ch. 83, § 16, whereas the

New York statute was six years until September 1, 1963, (former) N.Y.C.P.A. § 48(4); the period is now three years, N.Y.C.P.L.R. §§ 214(3), 218. However, this difference is not material to the result in this case. With respect to the violin, it has been shown that plaintiffs' *possession* thereof has been open and notorious and actual and exclusive since some time in November 1958. There was no showing, however, that plaintiffs' possession of the violin was hostile to the rights of the record owner or under a claim of right for any period of time. Consequently, plaintiffs have failed to carry their burden of proving that they acquired title to the violin by adverse possession.

By reason of lack of proof I am compelled to disallow any title in Rabinof or Mrs. Rabinof allegedly attained by gift or by adverse possession.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter of the action. 26 U.S.C. § 7426.

■ 2. This is an action to enjoin the enforcement of a tax levy served by the defendant upon plaintiffs demanding the production of the Lord Amherst Stradivarius violin and two valuable bows. Plaintiffs have possession of the said violin and bows and are thus proper parties. 26 U.S.C. § 7426.

■ 3. Defendant, United States of America, filed tax assessments against Dr. and Mrs. Bernard Mortimer on December 30, 1966. Those assessments are presumptively valid for the purposes of this action. 26 U.S.C. § 7426(e); United States v. Championship Sports, Inc., 284 F.Supp. 501, 508 (S.D.N.Y.1968).

■ 4. Pursuant thereto, on June 29, 1967, defendant filed liens against the Mortimers' property in both Chicago, Illinois and Montgomery County, Pennsylvania. Thereafter, defendant served plaintiff Benno Rabinof with the aforementioned Notice of Levy in Chicago, Illinois on June 30, 1967. Therefore, the United States is a proper party-defendant. 26 U.S.C. §§ 6321, 6331 and 7426.

5. Plaintiffs have failed to prove by a fair preponderance of the credible evidence that Dr. Mortimer and/or Mrs. Mortimer ever gave plaintiffs or either of them the Lord Amherst violin or the bows relating thereto or that said plaintiffs or either of them are entitled to said violin or the said bows by adverse possession or by the running of any statute of limitations or otherwise (see Findings of Fact and Discussion herein).

6. With respect to the violin, it has been shown that plaintiffs' possession thereof has been open and notorious and actual and exclusive since some time in November, 1958. There was no showing, however, that plaintiffs' possession of the violin was hostile to the rights of the record owner or under a claim of right for any period of time. Consequently, plaintiffs have failed to carry their burden of proving that they acquired title to the violin by adverse possession (see Findings of Fact and Discussion herein).

7. The United States of America is entitled to judgment dismissing the complaint herein and to vacation of the preliminary injunction herein, heretofore granted by Judge Metzner of this court.

8. There is no evidence in the record whatsoever to support plaintiffs' contention that they adversely possessed the two violin bows. Plaintiffs have no rights in the bows as a result of the running of any statute of limitations.

9. There being no basis to plaintiffs' claims of ownership of the violin and the bows, the complaint must be dismissed and judgment granted to defendant, United States of America. Title to the violin and the bows vests in the defendant and it may enforce its levy upon said chattels forthwith.

10. Defendant, United States of America, is entitled to judgment pursuant hereto togther with costs.

Settle judgment promptly upon notice.