In re PSINET INC., et al., Debtors.

No. 01–13213 (REG).

United States Bankruptcy Court, S.D. New York.

Sept. 25, 2001.

Wilmer, Cutler & Pickering, Washington, D.C., by Bruce Coolidge, Wilmer, Cutler & Pickering, New York City, by Andrew N. Goldman, Jorian Rose, counsel for debtors in possession.

Wachtell, Lipton, Rosen & Katz, New York City, by Chaim J. Fortgang, Amy R. Wolf, Scott K. Charles, for Statutory Committee of Unsecured Creditors.

Paul, Hastings, Janofsky & Walker, LLP, New York City, by Madlyn Gleich Primoff, David Fleischer, Richard J. Bernard, for NTFC Capital Corporation.

### DECISION ON OBJECTION BY NTFC CAPITAL CORPORATION TO DEBTORS' MOTION AUTHORIZING SALE OF ASSETS OF CANADIAN BUSINESS FREE AND CLEAR OF LIENS

ROBERT E. GERBER, Bankruptcy Judge.

NTFC Capital Corporation ("NTFC") objects to the Debtors' motion, dated June 18, 2001, seeking the Court's authorization for the sale of the assets of the Debtors' Canadian business free and clear of liens, claims and encumbrances, to Telus Corporation, or one or more of its subsidiaries ("Telus"), subject to higher and better offers.[1]

---

1. It is unnecessary, for the purposes of this decision, to discuss the nature of the Debtors' business or the details of the underlying sale transaction in very great detail. The Debtors are engaged in the business of providing Internet access and web hosting, to business customers, governmental entities and educational institutions, delivering their access products over a global fiber network. Through subsidiaries, the Debtors have been engaged in that business in a number of countries, including Canada. As of December 31, 2000 their total indebtedness was said to be approximately $3.7 billion, of which approximately $3.5 billion consisted of senior notes, capital lease obligations and notes payable. (Motion ¶¶ 7, 8, 11).

The gross consideration for the Telus sale would be $77 million, or as that might be modified as a consequence of any higher and better offers. *Id.* ¶ 36. (All monetary amounts in this decision are in U.S. dollars.) The disposition of the sale proceeds, if the transaction were approved by both this Court and the Ontario Superior Court of Justice in Toronto Canada (the "Canadian Court") with jurisdiction over the matter (discussed below), would be subject to further order of the two courts. (*See id.* ¶ 24 and Protocol discussed below).

NTFC contends, as more fully set forth below, that just after its predecessor in interest leased equipment (the "NTFC Equipment") to PSINet, Inc. ("the U.S. Parent"), the U.S. Parent contributed certain of that equipment, which would be included as part of the sale to Telus or any higher bidder (the "NTFC Canadian Equipment"), to the U.S. Parent's wholly owned subsidiary, PSINet, Ltd. (the "Canadian Subsidiary"), to capitalize the Canadian Subsidiary's business.[2] Thus, it is contended, the Canadian Subsidiary is the true owner of the NTFC Canadian Equipment,[3] and rights of NTFC under Canadian law must be respected. NTFC contends that for that reason, even if (as the Court now has done), this Court rules that the leases in connection with which the U.S. Parent obtained the NTFC Equipment are regarded as financing agreements rather than true leases, NTFC's consent must be obtained before the

NTFC Equipment can be sold to Telus or another third party, and such consent has been withheld.[4]

The Debtors and the Official Committee of Unsecured Creditors in this chapter 11 case ("Creditors' Committee," and with the Debtors, the "Estate"), who are allied in supporting the underlying motion and the underlying sale, contend to the contrary. They dispute, in particular, the factual premise upon which NTFC's objection is based—i.e., that the NTFC Canadian Equipment was given to the Canadian Subsidiary as a capital contribution—and the ultimate conclusion, that NTFC's consent is necessary incident to the sale.

An evidentiary hearing on the objection was held,[5] and the matter was extensively, and capably, briefed and argued.[6] The following are the Court's findings of fact and conclusions of law with respect to the NTFC objection.[7]

---

**2.** NTFC Obj. ¶ 1.

**3.** NTFC Obj. ¶ 2.

**4.** NTFC Obj. ¶ 5. NTFC states that it is willing to grant its consent to the sale of the NTFC Canadian Equipment free of liens and security interests if, but only if, NTFC receives what it regards as a satisfactory allocation of the proceeds of the sale of the Canadian assets to be paid over to NTFC at the closing of such sale. The Estate argues, among other things, that NTFC, by threatening a hold-up on approval of a major sale that is said to have broad creditor support and to benefit all of the Debtors' creditors, hopes to pressure the Debtors to validate NTFC's security interests. (Estate Reply ¶ 2).

This is a matter that the Court need not, and does not, consider. The Court will assume that each party is acting appropriately to advance its own economic interests, and prefers to analyze the dispute by simply ascertaining the underlying disputed facts, and then determining, based on those facts and the applicable law, the extent of NTFC's rights with respect to the NTFC Canadian Equipment.

**5.** The parties submitted exhibits and deposition testimony, but each ultimately elected not to supplement its presentation with live witness testimony.

**6.** After the underlying sale motion was filed, NTFC filed an objection, to which the Debtors and the Creditors' Committee filed a joint reply. Thereafter, NTFC filed a further reply. They are cited as "Motion ___"; "NTFC Obj. ___"; "Estate Reply ___", and "NTFC Reply," respectively.

**7.** The Estate makes a nonfrivolous point that the relief NTFC seeks—recharacterization of the ownership of the NTFC Canadian Equipment by reason of alleged equitable principles and, in essence, a determination that property belongs not to any of the debtors but rather a non-debtor entity (i.e., the Canadian Subsidiary)—requires an adversary proceeding under Fed.R.Bankr.P. 7001 (as a request for equitable relief, or for declaratory judgment with respect to it) (Estate Reply at ¶ 3 n. 4). Nevertheless, the Court believes that it is in the interests of justice to address the merits, particularly as the Estate has elected to do so.

## I.

In great part, the objection rests on its factual premises, and as a consequence, the Court's determination on NTFC's objection is heavily driven by factual findings. Many of the facts are undisputed, but the factual conclusions to be drawn from them, and from a weighing of the facts (some of which at least arguably cut in favor of each side), are sharply disputed. The Court first addresses the facts that are undisputed, and then the facts that the Court has found with which one side or another would likely disagree.

## A.

The NTFC Equipment was the subject of two equipment leases, initially between Nortel Networks Inc. ("Nortel") and the U.S. Parent, and then, after an assignment from Nortel to NTFC, between NTFC and the U.S. Parent. More specifically, Nortel, as lessor, and the U.S. Parent, as lessee, entered into:

(i) a master agreement dated December 22, 1999 (the "1999 Master Agreement") and associated lease schedule no. 1, dated December 22, 1999; and

(ii) a master agreement dated June 29, 2000 (the "2000 Master Agreement") and associated lease schedule nos. 1 through 5, dated June 29, 2000, September 11, 2000, September 29, 2000, December 29, 2000 and December 29, 2000, respectively (collectively, the "NTFC Leases").

Those leases involve equipment in both the United States and Canada, and while the equipment in the United States represents about seven-eighths of the total, the equipment in Canada is nevertheless of substantial value in absolute terms, having an original value of between $9 and $11 million.[8]

Whether each of the master leases that the U.S. Parent entered into with Nortel was a true lease, on the one hand, or was in fact (and/or law) a financing agreement, on the other, was disputed between the Estate and NTFC, at least until the briefing of the summary judgment motion that this Court heard on September 10. At this point, it no longer is in dispute that from the perspective of United States law (and the Uniform Commercial Code ("UCC") in particular), each of the NTFC Leases constitutes a financing transaction and not a true lease.

Each of the Agreements provides:
THE VALIDITY AND INTERPRETATION OF THIS MASTER AGREEMENT AND ANY LEASE SCHEDULE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED IN ALL RESPECTS BY THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS THEREOF.

*1999 Master Agreement § 22.2; 2000 Master Agreement § 22.2* (Block caps in original in each case).[9]

---

**8.** NTFC contends that the NTFC Equipment had an original total value of approximately $95 million. The Debtors do not concede that such is the proper figure, and state that they have computational (or perhaps other) differences with respect to both the amount of indebtedness associated with the NTFC Equipment as a whole and the portion of the NTFC Equipment that is NTFC Canadian Equipment. However, the Court assumes, without making findings in this regard, that NTFC has a very large claim and that these figures for the total indebtedness and the portion allocable to Canada reflect the order of magnitude of the amounts in controversy.

**9.** Other provisions of the 1999 Master Agreement also make reference to the law of New York. See §§ 1.3 ("this Master Agreement and each Lease Schedule constitutes a lease in-

Under the NTFC Leases, the U.S. Parent had the responsibility to pay for all of the NTFC Equipment, including the NTFC Canadian Equipment.[10] There was no express undertaking by the Canadian Subsidiary to pay for the NTFC Equipment that had come into its possession. The NTFC Leases were executed solely by the U.S. Parent and Nortel.[11]

Nortel's interests under the NTFC Leases (i.e., the 1999 Master Agreement, the 2000 Master Agreement and the six lease schedules) were assigned to NTFC pursuant to assignment and acceptance agreements dated December 30, 1999, June 29, 2000, September 11, 2000, September 29, 2000 and December 29, 2000 between Nortel and NTFC.[12] Each of the assignments provides that it is subject to the laws of the State of New York, again without regard to conflicts of law principles.[13]

At the direction of the U.S. Parent, certain NTFC Equipment subject to lease schedule no. 1 to the 1999 Agreement and lease schedule nos. 3, 4 and 5 to the 2000 Master Agreement was delivered directly to the Canadian Subsidiary in the Canadian Provinces of Ontario and Quebec, to be used exclusively by the Canadian Subsidiary.[14] That is the portion of the NTFC Equipment that was previously referred to as the "NTFC Canadian Equipment."

Neither Nortel nor NTFC recorded any claim of ownership and/or security interest with respect to the NTFC Canadian Equipment that is in the Province of Quebec. NTFC recorded a claim of ownership and/or security interest in the Province of Ontario, but it did so within three months of the bankruptcy filing of the U.S. Parent, making such filing voidable, as a preference under section 547 of the Bankruptcy Code, if United States law applies.

The NTFC Leases have differing provisions with respect to transfers of equipment by The U.S. Parent to its subsidiaries without NTFC's prior written consent. The 1999 Master Agreement provides:

LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, SUBLEASE, CONVEY, DELEGATE OR PLEDGE ANY OF ITS RIGHTS, INTEREST OR OBLIGATIONS IN, TO OR UN-

---

tended as security within the meaning of Article 9 of the Uniform Commercial Code as adopted by The State of New York"); 17.1(c) (Upon default, lessor may pursue any remedy it may have at law, in equity, or under any applicable statute, including, without limitation, the UCC "as adopted by The State of New York"). Another provision, ¶ 17.1(e), makes reference to the UCC as enacted in more than one jurisdiction; upon default, the lessor may pursue the rights and remedies of a secured party ("under the Uniform Commercial Code of The State of New York or of any other jurisdiction").

The 2000 Master Agreement provides similarly in each of those respects, except that its § 1.3 provides that the lease is intended as security within the meaning of Article 9 of the UCC "as adopted by The Commonwealth of Massachusetts." The parties agree that this was a drafting error.

**10.** 1999 Agreement (Rose Aff.Exh. 1) at § 3.3; 2000 Agreement (Rose Aff.Exh. 2) at § 3.3.

**11.** *Id.,* preambles.

**12.** See assignments (Rose Aff.Exh. 3).

**13.** See § 6 in each assignment (Rose Aff.Exh. 3).

**14.** Though there was some uncertainty as to whether NTFC Equipment subject to lease schedule no. 1 to the 1999 Master Agreement was likewise so delivered, the Court so finds. NTFC originally so asserted in its original objection (NTFC Obj. ¶ 9), but stated at oral argument that it was uncertain whether this was the case. One of NTFC's exhibits reflects that equipment of an original value of approximately $2 million covered under lease schedule no. 1 to the 1999 Master Agreement was delivered to a location in Ottawa, Ontario. (NTFC Exh. B, last two pages).

DER THIS MASTER AGREEMENT, ANY LEASE SCHEDULE OR ANY OF THE EQUIPMENT, WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Any such sale, transfer, assignment, sublease conveyance or pledge, whether by operation of law or otherwise, without the prior written consent of Lessor, shall be void.

1999 Master Agreement § 19.4 (Rose Aff. Exh. 1) (Block Caps in original).

The 2000 Master Agreement provides:

LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, SUBLEASE, CONVEY, DELEGATE OR PLEDGE ANY OF ITS RIGHTS, INTEREST OR OBLIGATIONS IN, TO OR UNDER THIS MASTER AGREEMENT, ANY LEASE SCHEDULE OR ANY OF THE EQUIPMENT, WITHOUT PRIOR WRITTEN CONSENT OF LESSOR, except (i) to a direct or indirect wholly-owned subsidiary of Lessee (provided that Lessee shall remain primarily liable for the payment and performance of its obligations hereunder, notwithstanding any such sale, transfer, assignment, sublease, conveyance, delegation or pledge), or (ii) in connection with an Event permitted by Section 16.1(f) above. Except as permitted by this Section 19.4, any such sale, transfer, assignment, sublease, conveyance or pledge, whether by operation of law or otherwise, without the prior written consent of Lessor, shall be void.

2000 Master Agreement, § 19.4 (Rose Aff. Exh. 2) (Block Caps in original).

The NTFC Canadian Equipment has been utilized solely by the Canadian Subsidiary in its business in Canada. The U.S. Parent is not registered or licensed to conduct business in Ontario or Quebec, Canada. The Canadian Subsidiary has been funded by the U.S. Parent on an "as needed" basis.

On May 31, 2001 (the "Filing Date"), the Debtors filed separate petitions for relief under chapter 11 of title 11 of the United State Code (the "Bankruptcy Code"). Also on the Filing Date, four of the U.S. Parent's Canadian Subsidiaries, PSINet Canada, PSINetworks Canada Limited, PSINet Realty Canada Limited and Toronto Hosting Centre Limited (collectively, the "Canadian Debtors") commenced restructuring proceedings (the "CCAA Proceedings") under the Companies' Creditors Arrangement Act (the "CCAA") in the Ontario Superior Court of Justice in Toronto, Canada (the "Canadian Court").[15]

On June 18, 2001, the Debtors filed the Canadian Business Sale Motion with this Court seeking approval of certain bid procedures and authority

(i) to sell substantially all of the goodwill, property, assets and rights used by the Debtors and non-debtor subsidiaries in carrying on the business of internet hosting, optical fibre communications and related activities in Canada (the "Canadian Assets") to Telus, or an alternate buyer with a higher and better offer;

(ii) to assume and assign certain executory contracts in connection with the sale; and

(iii) to enter into and consummate an Asset and Share Purchase Agreement dated June 15, 2001 (the "Asset Purchase Agreement").

---

**15.** After the underlying sale motion was filed, each of the Canadian Court and this Court approved a Cross-border Protocol (the "Protocol"), see Docket # 182, addressing, among other things, mechanisms to provide comity to each court, to avoid conflicting rulings, to resolve which matters would be determined by each court; and, in specified cases, to provide for joint consideration of matters of importance for both courts.

As prepared on June 15, 2001, the U.S. Parent was not a party to the Asset Purchase Agreement. However, a May 31, 2001 earlier term sheet ("Term Sheet") with respect to the transaction that ultimately was evidenced by the Asset Purchase Agreement,[16] and two drafts of the Asset Purchase Agreement, dated June 3 and June 4, 2001, three and four days after the date of the Term Sheet, respectively,[17] included the U.S. Parent as one of the "Vendors," a defined term generally referring to the entities on the seller side.[18] As one of the Vendors, the U.S. Parent was one of a number of undifferentiated entities making representations and warranties to the Purchasers at the time those drafts were prepared.[19]

By June 15, the U.S. Parent was no longer a party to the Asset Purchase Agreement, as a "Vendor" or otherwise. However, no admissible evidence was received from either NTFC or the Estate explaining why that was the case.[20]

On July 27, 2001, the Debtors filed a notice of amendment to the Canadian Business Sale Motion (the "Notice of Amendment"). Pursuant to the Notice of Amendment, the Debtors gave notice of their intention to amend the Asset Purchase Agreement to add the U.S. Parent as a Vendor party. When the U.S. Parent was added back in as a party, the representations and warranties that the U.S. Parent made as a Vendor were narrower than those which it made at the time of the earlier drafts of June 3 and June 4, when it was an undifferentiated member of the Vendor group.[21]

On August 3, 2001 the Debtors commenced an adversary proceeding against NTFC in this Court, with two counts: (1) seeking to recharacterize the NTFC Leases as financing agreements; and (2) seeking a declaratory judgment that by reason of the failure to record with respect to the portion of the NTFC Canadian Equipment in the Province of Quebec, and the voidability (as a preference) of the security interests that had been recorded in the Province of Ontario, NTFC's claims were not secured by the NTFC Canadian Equipment. Relief on the first count was ultimately not opposed by NTFC. On September 10, this Court granted summary judgment in favor of the Debtors on the first count, but denied summary judgment, by reason of material disputed issues of fact and because the Debtor's backup position raised matters not yet ripe for decision, on the second count.

On August 6, 2001, the Debtors filed a notice of (i) amendment to the Canadian Business Sale Motion, and (ii) adjournment of the hearing to consider approval of the sale, attaching thereto certain amendments to the Asset Purchase Agreement. The

16. NTFC Exh. T.

17. NTFC Exh. U, V, respectively.

18. See Exh. U at § 1.1.58 and listing of parties and Recitals cross-referenced therein.

19. See Exh. U at § 5.1.

20. While each of the Estate (Estate Reply at ¶ 5 n. 5) and counsel for the Creditors' Committee in oral argument set forth reasons for this, their statements were not backed up by documents, deposition or other testimony, or other admissible proof. NTFC argued in substance that the change could not have been an accident, but likewise offered no actual admissible evidence as to the reason. Many, if not all, of the arguments as to the reason offered by each of the two warring sides are reasonable; however, other than to conclude that the dropping of the U.S. Parent as a Vendor was not an accident, the Court is not in a position to make any factual findings as to why.

21. See Asset Purchase Agreement §§ 5.1.1, 5.1.7, 5.1.9, 5.1.10, 5.1.20, 5.1.23.

amendments included the addition of the U.S. Parent as a "Vendor" party to the Asset Purchase Agreement.

On August 14, 2001, NTFC filed its objection to the relief sought in the Canadian Business Sale Motion with respect to the NTFC Canadian Equipment. On or about August 17, 2001, NTFC filed a motion (the "Canadian Lift Stay Motion") in the Canadian Court for a declaration that the stay in the CCAA would not prevent registration of NTFC's rights of ownership (in contrast with security) in the NTFC Equipment in Quebec as against the Canadian Subsidiaries and third party transferees of the Canadian Subsidiaries, or, in the alternative, for relief from such stay to permit registration. NTFC has represented that the relief requested in the Canadian Lift Stay Motion was permissible under Canadian law. This Court has no reason to doubt that, though it does not make a finding in that regard.

On August 20, 2001, the U.S. Parent argued before this Court that the automatic stay imposed by section 362(a) of the Bankruptcy Code barred NTFC from pursuing the Canadian Lift Stay Motion in the Canadian Court. The Creditors' Committee supported the Debtors' position in this regard. In response to views this Court expressed with respect to that issue, which were expressed on an oral emergency request for relief by the Estate (without the benefit of briefing by the parties, but with the benefit of oral argument), NTFC did not pursue the Canadian Lift Stay Motion.

On August 22, 2001, the Debtors and NTFC entered into a stipulation, so ordered by this Court a few days later, with respect to the Debtors' efforts to obtain a judicial determination from this Court that the Lease Agreements were financing agreements that created a security interest and were not "true leases"—what the Debtors and NTFC referred to as the Recharacterization Count. The stipulation provided, in relevant part:

> With respect to (i) any adjudication of the Recharacterization Count of the Adversary Complaint, and (ii) issues concerning transfer of ownership of the NTFC Equipment from the Debtors to the Canadian Debtors (which was raised by NTFC in the NTFC objection), NTFC and the Debtors agree that these two issues shall be resolved in the first instance solely by the U.S. Court; *it being understood* that the U.S. Court shall be entitled—in accordance with the mandates of the cross-border protocol in place in the U.S. Cases (the "Protocol")—to consult with the Canadian Court with respect to any questions or concerns the U.S. Court may have arising out of the foregoing.

(Underlining in original).

As previously noted, on September 10 this Court heard the Debtor's motion for summary judgment seeking an order from this Court determining (a) that what appeared in form to be a lease should be regarded in law to be a financing agreement with respect to the NTFC Equipment, and (b) that Nortel and NTFC, having failed to perfect a security interest in the NTFC Equipment (or, to the extent they did, with respect to NTFC Canadian Equipment in Ontario, having received a voidable preference under United States law) could not avail themselves of any rights of a secured creditor with respect to the disposition of that Equipment, or its value. On that motion, this Court ruled that it was indeed a financing agreement; thus the owner of the equipment is either the U.S. Parent or the Canadian Subsidiary, but is not, in any event, NTFC. This Court ruled in connection with the second prong for relief that material issues of disputed fact exist with respect to which of the remaining two entities—the U.S. Par-

ent or the Canadian Subsidiary—owns the Equipment, and since each of whether a filing in Canada was required and could be avoided as a preference would turn on the owner of the equipment, that issue had to await the determination of the NTFC objection, addressed in this decision.

With all of this by way of background, NTFC contends (and the Estate disputes) that the U.S. Parent gave the NTFC Canadian Equipment to the Canadian Subsidiary as a capital contribution, a matter to which the Court now turns.

### B.

The parties agree that the "economic reality" of the "entire transaction" determines whether the U.S. Parent transferred ownership of the NTFC Canadian Equipment to the Canadian Subsidiary.[22] They have sharp differences, however, with respect to the applicability of caselaw cited by NTFC wherein, in a claims allowance

context, insiders' purported loans to debtors were recharacterized in bankruptcy as equity contributions, or wherein tax cases came to a like result.[23]

 After consideration of those cases and what the parties would like to extract from them, however, some of the parties' differences are more theoretical than real. Both categories of cases, either expressly or by implication, require a court to consider the economic realities of the transaction, in the context of the totality of the circumstances,[24] which, as noted above and below, the Court regards as appropriate and will endeavor to do. They also require a court to give rigorous scrutiny to transactions between business entities and their insiders (which, vis a vis the Canadian Subsidiary, the U.S. Parent plainly was);[25] this Court likewise considers such scrutiny appropriate here, and it will examine the facts accordingly.[26]

---

**22.** See NTFC Obj. ¶ 25; Estate Reply ¶ 4. The case cited by NTFC to support its assertion in this regard, *Pactel Finance v. D.C. Marine Service Corp.*, 136 Misc.2d 194, 518 N.Y.S.2d 317, 318 (Nassau Co. Dist.Ct.1987), deals with the recharacterization as a financing agreement of an alleged lease (rather than whether the use of a corporate parent's equipment by a subsidiary should be regarded as a capital contribution by the parent to the subsidiary), as does one of the cases cited by the Estate, *In re APB Online, Inc.*, 259 B.R. 812 (Bankr.S.D.N.Y.2001) (Bernstein, C.J.) More relevant, in the Court's view, are cases focusing on the economic realities to determine whether a conveyance, rather than a mere loan or grant of use of property, has occurred. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir.1995) (listing factors which help assess the true nature of a transaction, and stating that "[t]he root of all these factors is the transfer of risk"); *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545 (3d Cir.1979) (looking at the "parties' practices, objectives, business activities and relationships" to determine the true nature of a transaction, and citing allocation of risk as an "extremely relevant factor").

**23.** See NTFC Obj. ¶¶ 27–28 (loan recharacterization in bankruptcy claims allowance context), ¶ 29 (loan recharacterization in tax context); Estate Reply ¶¶ 35–38 (claims allowance context), ¶ 39 (tax context); NTFC Reply at 6–8 (both contexts).

**24.** *See Gilbert v. Commissioner*, 262 F.2d 512, 514 (2d Cir.), *cert denied*, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959) (court analyzes the "substantial economic reality"; determination must be made "in the light of all the facts of the particular case").

**25.** *See, e.g., WHBA Real Estate Ltd. Partnership v. Lafayette Hotel Partnership (In re Lafayette Hotel Partnership)*, 227 B.R. 445, 454 (S.D.N.Y.1998) ("since there is an incentive and opportunity to take advantage, dominant shareholders' and others insiders' loans in a bankruptcy must be subject to rigorous scrutiny")

**26.** NTFC states in its reply (NTFC Reply at 7) that the Estate appears to agree with NTFC with respect to the "heightened degree of scrutiny" applicable to transactions between shareholders and their corporations; whether

Where the parties part company, however, and where the Court cannot fully agree with NTFC, is where NTFC proposes that this Court try to shoehorn the facts with which the Court is faced here into the factors considered by other courts in determining whether insider claims for repayment for funds allegedly loaned to the business entities they controlled should be regarded, instead, as equity.[27] The Court believes that this is impractical, as those cases dealt with purported loans by the insiders to the debtors [28] and claims allowance situations where the insiders were seeking repayment as creditors. Here, by contrast, the Estate is simply contending that the U.S. Parent simply allowed its equipment to be used by its subsidiary.

Here, the U.S. Parent is not seeking the allowance of a claim from the Canadian Subsidiary with respect to the NTFC Canadian Equipment,[29] and is not contending that it made a "loan" at all in the context in which NTFC contends the U.S. Parent did [30] and in which the recharacterization cases addressed such a contention—particularly in demanding proof that what was claimed to be a loan really was a loan.[31] Here, by contrast, the Estate is contending that a conveyance alleged by NTFC never took place, and is relying, in part, on the lack of evidence that any conveyance did, in fact, take place. It is the mirror image of the factual context those cases addressed.

### C.

■ In considering the totality of the circumstances, looking the economic realities of the transaction, and in each case reviewing actions taken by the U.S. Parent with heightened scrutiny, the Court also finds, and weighs, the following additional

---

or not this characterization of the Estate's thinking is accurate, the Court considers it appropriate to engage in such scrutiny.

27. See NTFC Obj. ¶ 28 and cases cited therein.

28. Thus we see proposed factors like "the names given to the certificates evidencing the indebtedness"; the "presence or absence of a fixed maturity date"; and the "right to enforce payment of principal and interest." *See* NTFC Obj. ¶ 28. Another frequently considered—whether the alleged loan would have been made by a disinterested lender at the same time, *see, e.g., Official Committee of Unsecured Creditors v. Bambu Sales, Inc. (In re Interstate Cigar Co.),* 182 B.R. 675, 679 (Bankr.E.D.N.Y.1995) (Eisenberg, J.), and/or under the same terms, underscores how difficult it is to adapt these factors to a factual situation like the one at bar, as it is difficult to see how anyone else could be in a position to allow its equipment to be used by the Canadian Subsidiary. These matters, among others, cause this Court to conclude that any attempt to apply the loan recharacterization factors to a factual situation like this one would be excessively mechanical and ill-advised.

29. The Court has added the important qualification, "with respect to the NTFC Canadian Equipment." The Court assumes, without deciding, that the U.S. Parent may very well file one or more claims in the CCAA Proceeding with respect to intercompany advances of money, and/or other cash actually loaned to the Canadian Subsidiary, or may already have done so.

30. *See, e.g.,* NTFC Obj. ¶ 27 (while the U.S. Parent might attempt to claim that it only "loaned" the NTFC Canadian Equipment to the Canadian Subsidiary, "[i]n the absence of any documentation to support this characterization, however, the transaction must be deemed a capital contribution").

31. Likewise, the U.S. Parent is not seeking the allowance of a bad debt deduction as a consequence of a purported loan on which it could not recover. *Compare Gilbert, supra,* 262 F.2d at 512; *Montclair, Inc. v. Commissioner,* 318 F.2d 38, 40 (5th Cir.1963); *Estate of Mixon v. United States,* 464 F.2d 394, 394 (5th Cir.1972).

facts.[32]

The starting point for the analysis is that, without dispute, and as the Court finds, there is no document comprising or evidencing any conveyance, assignment, or other transfer of any of the NTFC Canadian Equipment to the Canadian Subsidiary. This is not the ending point of the analysis, of course, but it is a significant factor. At all relevant times, the U.S. Parent was the lessee of record, and NTFC is attempting, in essence, to argue that by review of the "economic realities," and/or application of equitable principles, the Court should engage in the fiction—and determine as a fact—that the U.S. Parent nevertheless transferred the NTFC Canadian Equipment to the Canadian Subsidiary. But looking first at the totality of the circumstances, and then at factors used to judge the "economic realities," the Court believes that it cannot agree with NTFC in this regard; both means of analysis lead to the same conclusion, that no conveyance or assignment here was made.

### (1)

Turning first to the totality of the circumstances, there was no document, as the Court has noted, comprising or evidencing any conveyance, assignment or other transfer to the Canadian Subsidiary. If there were other proof, circumstantial or otherwise, that the U.S. Parent had made the alleged transfer, the Court would certainly take that into account, but here there is no evidence of that. To the contrary, the U.S. Parent engaged in the activities one would normally associate with the trappings of ownership, and retained the rights associated with such. The U.S. Parent, and not the Canadian Subsidiary:

—kept the NTFC Canadian Equipment on its books and records;

—depreciated the NTFC Canadian Equipment, along with the remainder of the NTFC Equipment;

—bore the risk of loss, and insured the entirety of the NTFC Equipment—including, expressly, the portion of the NTFC Equipment that was located in Canada and used by the Canadian Subsidiary;

—retained control over the NTFC Equipment, including the NTFC Canadian Equipment; and

—was subject to the "market risk" (i.e., the risk that the value of the NTFC Equipment would fall to a point below the debt to be repaid with respect to it, or that the return on the use of equipment would fall below the debt yet to be repaid), as the U.S. Parent was billed for, and paid, the entirety of the obligations associated with the acquisition of the NTFC Equipment, including the obligations that could be attributed to the NTFC Canadian Equipment.[33]

In addition to the objective manifestations of a transfer, the Court has considered the U.S. Parent's intent also to be of significance, and has considered NTFC's contentions with respect to that intent.[34] In arguing that the NTFC Canadian

---

**32.** The totality of the circumstances so reviewed includes a variety of factors urged by each side, all of which the Court has considered to one degree or another. Obviously, however, not all of them can be regarded as of like importance, and the Court could not, and did not, engage in a counting exercise.

**33.** It is undisputed, as NTFC notes, that the NTFC Canadian Equipment was shipped by Nortel directly to Canada, for use by the Canadian Subsidiary, but the use by an entity, or possession by it, is not the same as ownership, and, most assuredly, not a basis for a finding of a capital contribution, at least in the absence of other factors suggesting such a result.

**34.** *See Liona Corp., N.V. v. PCH Associates (In re PCH Associates),* 804 F.2d 193, 200 (2d Cir.1986) (affirming orders of Bankruptcy Court (Lifland, J.) and District Court (Tenney,

Equipment was conveyed from the U.S. Parent to the Canadian Subsidiary, NTFC relies on asserted admissions in two passages from the deposition testimony of the U.S. Parent's Treasurer Michael Erfurt, assertedly relevant to that intent and/or to a conclusion that the transfer actually was made. The testimony generally is to the effect that (1) it was necessary to transfer the assets to the Canadian Subsidiary in order to correct what Erfurt and another had concluded was a mistake,[35] and (2) a transfer of the type NTFC contends to have been made would have been consistent with prior intercompany transfers.[36]

"Intent," upon consideration of the ways in which it is significant here, is subject to a double entendre. If, by "intent," NTFC had established evidence of what the U.S. Parent *believed to have been done* (in the past)—whether it actually had been done or not—the Court would find that intent quite relevant, and probably of some significant probative force. But here NTFC offered evidence of "intent" of a different type—not with respect to the past, as to what had happened, but rather the future—what *should* happen, when, by definition, it had not happened.

The Court believes, and finds, that references quoted by NTFC dealt with what the witness thought *should have been done*, i.e., what was desirable *to be done*, and not what *had been done*.[37] With respect to what actually had (or had not) been done, the Court finds the testimony

---

J.), holding that sale-leaseback arrangement was a joint venture agreement, rather than lease that debtor was required to assume or reject; "[i]t seems clear that no true lease was contemplated by the parties here"); *European American Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*, 158 B.R. 926, 932 (Bankr.S.D.N.Y.1993) (Brozman, J.) (court would look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a debtor's estate, and would examine economic substance "to determine the true intent of the parties in entering into the transaction").

**35.** See NTFC Obj. ¶ 25 at page 12:
Q. You and Mr. Hollis agreed that it was necessary to transfer the assets in order to correct what was, as you and he concluded, a mistake, is that correct?
A. Yes.
Erfurt 8/2/01 Dep.Tr. at 106:14–18.

**36.** See NTFC Obj. ¶ 25 at pages 12–13. This passage provides, in relevant part:
Q. Are you aware of any intercompany indebtedness owing by the Canadian subsidiaries of PSINet Inc. to PSINet Inc.?
A. I believe there are some intercompany equipment transfers.
Q. Can you describe what those transfers were or are?
A. Yes .... it was like $8.5 million of equipment that was transferred up there [by

The U.S. Parent to its Canadian subsidiaries].…
Q. Do you know the purpose of that transfer?
A. I believe it was because the assets were being utilized in Canada.
(*Id.* at 23:7–25:4). It should be noted, by way of clarification, that this was different equipment than the NTFC Equipment (referred to in the depositions as the Nortel equipment.) (*Id.* at 24:7–9).

**37.** See, e.g., other testimony, appropriately considered under F.R.C.P. 32(a)(4):
Q. Did the people in your own group say that it was a mistake, that the assets should have been transferred?
A. Yes.
(*Id.* at 103:13–16; *accord id.* at 104:19–20 (the assets "should have" been transferred to Canada)).
Q. Did you and Mr. Hollis discuss how to rectify the situation?
A. Yes.
Q. What did you discuss in that regard?
A. Step 1 is we need to identify the assets that will fall under that situation.
Q. And Step 2?
A. You know, in essence, make the transfers.
Q Have the transfers been made?
A. No.
(*Id.* at 105:7–16).
Q. Has PSINet ever transferred ownership of any of the equipment identified on Exhibit 6 [a listing of the Canadian assets]?

of the U.S. Parent's Treasurer Michael Erfurt to be credible, and consistent with all of the other evidence, when he testified that the transfers NTFC says were made in fact were never made.[38]

The Court also finds that the purpose of earlier intercompany accounting entries when other (non-NTFC) equipment had been used by the Canadian Subsidiary was the fact that "the assets were *being utilized* in Canada"—not that they had been alienated to the Canadian Subsidiary.[39] The Estate asserts that even if the NTFC Canadian Equipment had been carried as an asset on the inter-company books and records of the Canadian Subsidiary, such a bookkeeping entry would not establish a conveyance of title to the NTFC Canadian Equipment.[40] The Court agrees to the extent of concluding that such, without more, would not establish such a conveyance.

Since the alleged conveyance is said to have taken place between the U.S. Parent and its Canadian Subsidiary, the Court finds the acts and intent of the U.S. Parent to be substantially more significant than the acts and intent of Nortel or NTFC. Nevertheless, the Court's determinations with respect to the alleged capital contribution are not undercut, and indeed are bolstered, by the acts and implied intent of NTFC. In choosing to purchase the equipment leasing documentation from Nortel, NTFC looked solely to the creditworthiness of the U.S. Parent.[41] Also, since the alleged transfer is argued to have taken place immediately, when Nortel was still in the picture and not after the Nortel–NTFC assignment, Nortel's anticipation and understanding is somewhat relevant. Nortel knew that some of what would later be called the NTFC Equipment would be deployed in Canada, and shipped it there, but Nortel viewed itself as dealing with the U.S. Parent and not with any Canadian Subsidiaries.[42]

A No.

Q. To your knowledge, has PSINet ever transferred any rights under the leases relating to this equipment to the Canadian subsidiaries?

A. No.

(*Id.* at 61:8–15).

**38.** See. n. 37 above. NTFC makes a number of points based on the difference between the 1999 Master Agreement, which prohibited transfers to corporate affiliates without lessor consent, and the 2000 Master Agreement, which expressly permitted them. The different language in the 2000 Master Agreement plainly suggests consideration by the parties that the conveyance that NTFC argues had been made might in fact be made, but this permissive language—authorization to make the transfer—once more does not establish that the transfer actually was made.

Bolstering the Court's conclusions in this regard is the lack of any evidence of any conveyance of the NTFC Canadian Equipment in the context of normal business practices and common sense. The Court regards it as highly unlikely that an entity like the U.S. Parent would have transferred assets of a value in excess of $7 million without having some document, or accounting entry, evidencing the alleged conveyance.

**39.** The Court finds it to be a considerable jump to go from the possession or use by the Canadian Subsidiary of the NTFC Canadian Equipment and a conclusion that the NTFC Canadian Equipment was conveyed to the Canadian Subsidiary. *See Rabinof v. United States,* 329 F.Supp. 830, 840 (S.D.N.Y.1971) (possession of property "is the lowest species of evidence with respect to actual ownership, and can be overcome by any contrary evidence that another is the true owner").

**40.** Estate Reply ¶ 18.

**41.** Authority for this, which includes matter filed under seal, is available to parties entitled to access to such matter upon request.

**42.** Authority for this, which includes matter filed under seal, is available to parties entitled to access to such matter upon request.

Each of NTFC and the Estate made nonfrivolous contentions based on arguable inconsistencies with the other's present position based on actions its opponent took earlier this year. Each accused the other of what may fairly be characterized as species of prior inconsistent statements, discussed in turn.

Firstly, NTFC noted that when the Term Sheet and the first two drafts of the Asset Purchase Agreement were prepared, the U.S. Parent was a Vendor party, but that by the time the sale motion was filed, the U.S. Parent was no longer such. Though NTFC did not have evidence of the reason for the change, NTFC contended, with some force, that the change was intentional. NTFC further argued that the change reflected a belief on the part of the U.S. Parent that there was no need for the U.S. Parent to be a Vendor party, even though NTFC Canadian Equipment was to be part of the sale.

Secondly, NTFC noted that the Canadian Debtors represented that they had ownership of all of the Purchased Assets (presumably including the NTFC Canadian Equipment), and that as the Estate was now contending that this was not the case (because the U.S. Parent owned the NTFC Canadian Equipment), such representations were prior inconstant statements.

Similarly, the Estate also made a prior inconsistent statement point. It noted that NTFC reserved the right to seek adequate protection (which is based on the use of estate property) for property that NTFC now asserts was *not* estate property.

While the prior inconsistent statements (particularly those noted by NTFC) have some probative value, on balance the Court finds the prior inconsistent statements to have only modest probative value, and ultimately not to trump the other matters described above. Looking at

them in the context of a drafting process that was of considerable complexity and ran over a period of only about two weeks (measured by a May 31 Term Sheet and June 15 Asset Purchase Agreement date), they establish little more than the truism that, like all of us, lawyers sometimes err, and/or fail to focus on things or the implications of things. While the Court assumes that the deletion, somewhere between June 4 and June 15, of the U.S. Parent as a "Vendor" was not inadvertent, there are too many reasons why this might have happened to conclude that it was based on a focused belief that the U.S. Parent should be stricken as a Vendor because it had given away the NTFC Canadian Equipment to the Canadian Subsidiary—which would be the true underpinning for a genuine prior inconsistent statement. Similarly, given the frequency, if not inevitability, of drafting errors in complex corporate documents, even documents of lesser complexity than the Asset Purchase Agreement (e.g., the inclusion of references to Massachusetts law in the 2000 Master Agreement, when all parties agree that the inclusion of the reference to Massachusetts law was inadvertent), the Court feels uncomfortable in drawing too much from what could simply have been another case of inadvertence, the continuation of the representation of ownership of the equipment being sold after the U.S. Parent was deleted as a Vendor party.

Similarly, it is true, as the Estate argues, that NTFC would have had no business seeking adequate protection from the U.S. Parent or any of the other Debtors with respect to the NTFC Canadian Equipment if the NTFC Canadian Equipment belonged to the Canadian Subsidiary, and the Court fully understands the Estate's point that this was inconsistent with NTFC's stated position now that the U.S. Parent no longer owns the NTFC Canadi-

an Equipment. Nevertheless, and as before, in the absence of proof that NTFC's position in this regard was one of conscious consideration, the Court is reluctant to draw too much from it.

Thus, under the totality of the circumstances, these matters (particularly since they are subject to too many uncertainties, and are not as directly to the point as the other factors, discussed above) do not change the Court's finding that the U.S. Parent did not convey the NTFC Canadian Equipment to the Canadian Subsidiary, and that the Court should not engage in fictions to make a finding that the U.S. Parent did so.

### (2)

The Court reaches like conclusions if it measures the economic realities by reference to certain indicia historically considered by courts in determining whether an assignment was made.[43] The Estate makes reference to three in particular:

—the exercise of dominion and control;

—the risks of ownership; and

—the intent of the parties.

The application of those indicia overlaps substantially, of course, with the Court's review of the totality of the circumstances described above. With respect to the first of them, the Estate argues that in order to have made the alleged assignment, the U.S. Parent would have had to have completely relinquished its right to control the property, and that the U.S. Parent did nothing of the kind. To the contrary, the

Estate argues, the U.S. Parent retained the right to do whatever it wished with any or all of the NTFC Equipment.

In this respect, the Court agrees. The record is devoid of any evidence of any limitations on the part of the U.S. Parent to redeploy, move, or remove any of the NTFC Canadian Equipment from Canada to any other locale, and the Court finds as a fact that there were no such limitations.[44]

With respect to the second of the indicia, the retention of the associated risk, the Court finds that the U.S. Parent did indeed retain the risk. Technically, the U.S. Parent retained two arguably different kinds of risk—(1) the risk that the U.S. Parent would have to keep paying for the NTFC Equipment, including the NTFC Canadian Equipment, even if the value of that equipment, or the return that the U.S. Parent could make on its use, went down faster than the debt associated with it; and (2) the risk of a casualty loss, for which the U.S. Parent was obligated to, and did, maintain insurance. Similarly (though the Court regards this as unlikely), if the value of the NTFC Equipment increased beyond expectations, or was worth more than a peppercorn at the conclusion of the lease term, the U.S. Parent would be entitled to take advantage of any increase.

With respect to the third of the indicia, intent, the Court's analysis is essentially the same as its discussion of intent as discussed above in connection with the totality of the circumstances. The Court finds no evidence of an intention on the

---

43. As the Court reaches the same conclusion, and makes the same findings, under either method, it is not called upon to determine which is preferable. For the most part, NTFC's objection focused on the factors discussed above in connection with the totality of the circumstances, and the Estate argued both approaches, with particular emphasis, in oral argument, on the latter.

44. The Court so finds not because of the usual power of a corporate parent to exercise control over its subsidiary, but by reason of the absence of proof of any divestiture or limitations on its rights as an underlying owner of the NTFC Canadian Equipment.

part of the U.S. Parent to have made the alleged conveyance, as a capital contribution or otherwise, of the NTFC Canadian Equipment to the Canadian Subsidiary. At most the Court finds a view on the part of decision makers at the U.S. Parent that effecting such a transfer, and/or reflecting such a transfer on intercompany accounts, would be a good idea, and "should be" done. As noted above, the Court does not regard this as tantamount to a past transfer or conveyance.

Under this mode of analysis as well, the Court finds that the alleged capital contribution was not made.

### (3)

Each of the two sides makes other assertions as to matters it argues support the factual conclusion it would urge that the Court make. For NTFC, those assertions (shorn of repetition) include those that:

—the U.S. Parent has historically funded the capital requirements of the Canadian Subsidiary on an "as needed" basis;

—the U.S. Parent has its principal place of business in Virginia;

—the NTFC Canadian Equipment was delivered to the Canadian Subsidiary in Canada, and directly installed for the Canadian Subsidiary's use in its Canadian business;

—the U.S. Parent is not authorized to conduct business in Ontario or Quebec;

—the Canadian Subsidiary is authorized to conduct business in Ontario and Quebec;

—the Canadian Subsidiary has always had, and continues to have physical possession of the NTFC Canadian Equipment;

—the Canadian Subsidiary is responsible for the maintenance of the NTFC Canadian Equipment and generates revenue from its use;

—the 2000 Master Agreement (though not the 1999 Master Agreement, which also covers NTFC Canadian Equipment) permits a transfer to a subsidiary without NTFC's consent; and

—no terms exist for the Canadian Subsidiary's payment to the U.S. Parent for NTFC Canadian Equipment.

For the Estate, other points (shorn of repetition) include assertions that:

—the Canadian Subsidiary never undertook the burdens associated with the ownership that NTFC claims the Canadian Subsidiary acquired; and

—NTFC is illogical in asserting that the U.S. Parent has ongoing liability for the NTFC Canadian Equipment, but that the U.S. Parent has somehow given up ownership of the NTFC Canadian Equipment.

In the Court's view, these have no more than modest significance, and, at best, do not materially add to the points previously addressed;[45] certainly all pale in importance to the matters discussed above.

### (4)

For all of the foregoing reasons, the Court finds, as a fact, or as a mixed question of fact and law, that the NTFC Canadian Equipment was not conveyed to the

---

**45.** With respect to the only one of these that the Court believes merits further discussion, that historically, the U.S. Parent funded the Canadian Subsidiary on an "as needed basis," the Court finds this insufficient to be a significant factor in the absence of additional proof that the contribution as capital of the NTFC Canadian Equipment (as contrasted to simply letting the Canadian Subsidiary use the NTFC Canadian Equipment) was intended to be, and was, a conscious means of satisfying a capital need.

Canadian Subsidiary, and remains property of the U.S. Parent.

## II.

NTFC objects to the sale, insofar as NTFC Canadian Equipment is concerned, asserting that:

(i) ownership of the NTFC Canadian Equipment has been transferred and contributed as capital by the U.S. Parent to the Canadian Subsidiary;

(ii) the NTFC Canadian Equipment does not constitute property of any of the Debtor's U.S. Bankruptcy estates under section 541(a) of the Bankruptcy Code, allegedly divesting this Court of jurisdiction over the NTFC Canadian Equipment under 28 U.S.C. § 1334(e); [46] and

(iii) under Canadian law, which law allegedly controls with respect to the NTFC Canadian Equipment, NTFC's consent to the sale of the NTFC Canadian Equipment free and clear of NTFC's alleged liens and security interests is required.[47]

Consideration of the first and second of those points turns on the factual analysis described in Sections I(A) and (C) above, in which the Court applied the legal standards described in Section I(B) above. The third point likewise rests on the determination of the first point, or at least starts with it, though with consideration of principles of conflicts of law and international comity as well.

### A.

■ As noted in Section I(C) above, the Court has found as a fact, or as a mixed question of fact and law, that the U.S. Parent did not convey the NTFC Canadian Equipment to the Canadian Subsidiary, as a capital contribution or otherwise. As the Court has so found after consideration of the totality of the circumstances and the economic realities (and not just the fact that there was no conveyance from the U.S. Parent to the Canadian Subsidiary), the Court sees no need or basis for engaging in a further inquiry, such as whether, notwithstanding such finding, the Court should engage in a fiction that the alleged capital contribution to the Canadian Subsidiary nevertheless occurred.

Likewise, as the Court has found that the NTFC Canadian Equipment, like the remainder of the NTFC Equipment, was not conveyed to the Canadian Subsidiary and remains property of the U.S. Parent, the NTFC Canadian Equipment plainly is property of the Debtor U.S. Parent under section 541(a) of the Bankruptcy Code, and the Court has jurisdiction over it under 28 U.S.C. § 1334(e).

### B.

There remains the issue as to whether, under these circumstances, NTFC can assert the rights it says it has under Canadian law to require its consent to the sale. If the Court understood NTFC correctly at oral argument, NTFC contends that it has the rights it says it has under Canadian law even if it were to be determined, as the Court now has done, that the NTFC Canadian Equipment was not conveyed to the Canadian Subsidiary, by reason of the NTFC Canadian Equipment's locus in Canada. If that is, in fact, NTFC's fallback position, the Court cannot agree.

---

**46.** That section of the Judicial Code provides: The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

**47.** NTFC Obj. ¶ 22.

■ Where, as here, this Court's subject matter jurisdiction is based on 28 U.S.C. § 1334, the Court applies, with respect to matters of state law, the conflicts of law principles of the forum state, *i.e.*, the State of New York. *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 605–607 (2d Cir.2001) (so holding); *In re Koreag Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir.1992), *cert. denied*, 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992) (arguably dictum); *Official Committee of Unsecured Creditors of Lois/USA, Inc. v. Conseco Finance Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69 (Bankr.S.D.N.Y.2001) (*"Lois"*) (Gerber, J.) (citing *Bianco*, and explaining rationale). Under New York's conflicts of laws rules, where, as here, the parties have agreed upon the law to govern their relations, that agreement will normally be honored. *See Lois*, 264 B.R. at 91–93 (explaining rationale, and noting exceptions not applicable here).

■ As the Second Circuit noted in *Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987), also construing New York law:

When such a provision exists and the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance, New York law requires the court to honor the parties' choice insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated.

*Id.* at 551 (citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 381, 165

N.Y.S.2d 475, 486, 144 N.E.2d 371, 379 (1957); *Restatement (Second) of Conflicts of Law* § 187). *See also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir.1996) (stating, without articulated exceptions or qualifications, that "New York law gives full effect to parties' choice-of-law provisions," citing *Woodling* ).

As noted in Section I(A) above, each of the 1999 Master Lease and the 2000 Master Lease provides that:

The validity and interpretation of this master agreement and any lease schedule and the rights and obligations of the parties hereto shall be governed in all respects by the laws of the state of New York without giving effect to the conflicts of laws provisions thereof.

1999 Master Lease § 19.4; accord 2000 Master Lease § 19.4 (Blocks caps in each case deleted here, for readability).

The scope of the parties' choice of law agreement broadly governs "the rights and obligations of the parties ... in all respects," and there has been no suggestion by NTFC that the invocation of New York law was inappropriate by reason of insufficient nexus with New York or concerns as to public policy. Thus, unless principles of international comity trump the conflicts of law principles that otherwise would apply, this Court must apply New York law with respect to matters within the scope of the above-quoted choice-of-law clause, *see Krock*, 97 F.3d at 645, and United States law with respect to matters of federal law.[48]

---

48. A corollary of that is that United States law will continue to apply with respect to the avoidance of NTFC's liens. It is undisputed that if U.S. law applies, NTFC's liens on the NTFC Canadian Equipment located in Ontario can be avoided as preferences under section 547 of the Bankruptcy Code. In light of the Court's rulings above that the NTFC Ca-

nadian Equipment was not conveyed to the Canadian Subsidiary, any rights of NTFC as a secured creditor with respect to the NTFC Canadian Equipment located in Ontario rest on a conclusion by this Court that the law of Canada (under which the Ontario security interest would not be voidable), as contrasted to the law of the United States, applies.

■ However, NTFC argued in connection with its request for relief from the stay, and, if the Court understood NTFC correctly, has argued again, that by reasons of principles of comity, this Court should apply the law of Canada instead. The Court does not agree.

As it stated when ruling on NTFC's request for relief from the automatic stay, this Court takes obligations of comity seriously, particularly where, as here, the two legal systems involved, those of the United States and Canada, share common commercial values and values of fairness and due process. And if NTFC were asking this Court to afford comity to a decision of the Canadian Court, any such request would presumptively be granted.

But the comity NTFC seeks to invoke is a different kind of comity, which while plainly respected when it is applicable, is in essence a conflicts of law analysis. Indeed, when NTFC spoke of "Canada's stronger interest in regulating the protection and perfection of ownership interest against tangible personal property located within its borders," [49] that was a classic conflicts of law analysis. So was NTFC's discussion of *Maxwell Communication Corp. v. Societe Generale*, 93 F.3d 1036 (2d Cir.1996), which NTFC argued to support its argument that for reasons of international comity, this Court should not permit the avoidance of preferences that is an element of U.S. federal law.

Thus it is appropriate to consider the effect of *Maxwell* on the choice of law analysis here—and in particular, whether NTFC's security interest, voidable as a preference under section 547 of the Bankruptcy Code, should be regarded as immune to attack because the security interest attached to property physically located in Canada of a U.S. Debtor, and when, under Canadian law, the security interest could not be avoided as a preference.

In *Maxwell*, the Second Circuit considered whether United States Bankruptcy Courts should apply the law of the United States, under which a preferential payment could be avoided, where an English debtor made payment to an English bank (but where part of the funds used to effect the preference came from the United States), and where, under the law of England, there would not be an avoidable preference. The interests of comity required the United States Court not to apply U.S. law under the facts presented there, and required, instead, deferring to the law of England.

In *Maxwell*, the debtor was English; two of the banks were English; the debt was incurred in England; the debtor negotiated with creditors in England; and the relevant documents provided that English law would govern any disputes.[50] The transaction was inherently "English," involving the repayment of loans by the English parent to English banks. Based on those facts, the Second Circuit concluded in *Maxwell* that the doctrine of international comity precluded application of American avoidance law to transfers in which England's interest had primacy.

But consideration of the factors in *Maxwell* causes this Court to conclude, that for many of the same reasons that the Second Circuit there approved deference to the law of England, here this Court should apply the law of the United States. Looking at the analogous considerations, the

---

**49.** See NTFC's brief on its application for relief from the stay, ¶ 42.

**50.** Moreover, as NTFC noted at ¶ 41 of its relief from stay motion, the debt was ultimately repaid from bank accounts in England, despite the fact that some of the money transferred came from proceeds of the sale of the debtor's U.S. subsidiaries.

debt was incurred in the United States; the bank in question—the preference recipient, NTFC—is American; the entity responsible for the payments to NTFC—the U.S. Parent—is American; the agreements provide that they are governed by New York law; and repayment to NTFC will wholly or principally be made from bank accounts in the United States, despite the fact that some of the money to do so may come from proceeds of the sale of the Debtors' Canadian subsidiaries. The transaction was inherently "American."

Thus here, the *Maxwell* factors cause American law to apply. The fact that property owned by the Debtor U.S. Parent, the NTFC Canadian Equipment, is physically situated in Canada does not come close to outweighing the many factors noted above.

■ The teaching of *Maxwell* is that interests of comity are to be respected, but that in determining which law is to be afforded comity, a court should look at the totality of the circumstances to determine the concerns that are to be advanced, and which jurisdiction has a more appropriate interest in regulating such concerns. While *Maxwell* plainly holds that United States courts should afford comity when the interests to be advanced are primarily foreign, there is nothing in *Maxwell* that leads the Court to believe that when the exact opposite is true, comity requires a disregard of United States law, and section 547 of the Bankruptcy Code in particular.

Accordingly, the law of New York, insofar as state law is relevant, and the law of

the United States, insofar as federal law is relevant, will be applied to the relations between the Debtors and NTFC. To the (considerable) extent the NTFC objection rests on Canadian law, or rights NTFC would have only if U.S. law is inapplicable, its objection is overruled.[51]

### C.

For the foregoing reasons, the Court need not decide, and does not decide, other matters raised by the Estate, including its estoppel point;[52] its contention that acceptance of NTFC's contentions would be inequitable to unsecured creditors;[53] and its contention that NTFC is trying to get an unfair leg-up, to force acknowledgment of its liens, and/or otherwise engaging in inequitable conduct.[54]

### D.

The Estate additionally offered other evidence, and made an additional argument,[55] that the Estate submitted to the Court under seal. The Court concluded that this additional evidence had insufficient relevance to the matters above, and, as NTFC had argued in its papers, the probative value of this evidence was outweighed by potential confusion and prejudice to NTFC. As stated at the oral argument at the hearing, NTFC's objection to the admissibility of such evidence was sustained.

### III.

As noted at the outset, this decision represents the Court's findings of fact and conclusions of law with respect to the

---

51. That applies directly to any alleged rights with respect to NTFC Canadian Equipment in Ontario, and NTFC's contention that its Ontario liens are protected from avoidance under section 547. The Debtors may, if they are so advised, bring further proceedings with respect to resolving any open issues with respect to lien avoidance based on this decision.

52. Estate Reply ¶ 32.

53. *Id.* ¶¶ 33–34.

54. *Id.* ¶¶ 2–3, 39.

55. Estate Reply ¶¶ 40–41.

NTFC objection. If the motion is granted and the sale is authorized, the Court will then enter an order approving the sale, from which an appeal with respect to this decision may, if desired, be taken.

 Though, for the reasons set forth above, the Court does not agree with NTFC's points on the merits of its objection, the Court agrees with NTFC that insufficient cause exists to dispense with the automatic 10–day stay of an order authorizing a sale and/or assignment of an executory contract under Fed.R.Bankr.P. 6004(g) and 6006(d). The Debtors made no evidentiary showing of a business exigency requiring a closing within 10 days of an approval order, and even the Motion contained no more than a contention that the 10–day period should be eliminated where there "has been no objection to the procedure" (a factor plainly inapplicable here), and a generalized assertion that the Debtors require "an expedited closing" after all closing conditions have been met or waived.[56] Significantly also, when opposing NTFC's earlier request for relief from the stay, the Estate expressly noted the availability of the 10–day stay as an additional basis for the assertion that its opposition at that time would not prejudice NTFC.[57]

If an order is entered approving the sale, it will provide for such a 10–day stay.[58]

### IV.

For the foregoing reasons, NTFC's objection to waiver of the 10–day stay is sustained, but its objection is otherwise overruled. The Court will proceed with the remainder of the issues associated with the sale of the Canadian business on Wednesday, September 26. If the sale motion is granted at that time, any order submitted in connection with that approval should also include decretal provisions addressing the matters determined in this decision (without discussion or characterization, other than to reference the reasons set forth in this decision), from which NTFC, if it is so advised, may take an appeal. The time to appeal from this decision will run from the entry of any such order, and not from the date of this decision.

---

**56.** See Motion ¶ 34, 35.

**57.** See Joint Objection of the Debtors and Statutory Creditors' Committee to NTFC's Motion for Relief from the Automatic Stay (Docket # 401), at ¶ 6 n. 3

**58.** Needless to say, this determination is wholly distinct from, and should not be considered an expression of views in any way with respect to, a decision on any request for a stay, by this Court or the District Court, and/or any conditions (e.g. the necessary bond) that might be imposed if a request for stay is granted. Such matters will be ripe for determination only if a sale order is granted, and a request for stay is made.